# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

EBRUM WILLIAMS,          )
                               )

      **Plaintiff,**         )
                               )

      **vs.**             )      **Case number 4:10cv0886 TCM**
                               )

MICHAEL J. ASTRUE,         )
Commissioner of Social Security,    )
                               )

      **Defendant.**       )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Ebrum Williams (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed an opening brief and reply brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB and SSI in November 2005, alleging he was disabled as of July 2003 by throat cancer, chronic back pain, bilateral carpal tunnel syndrome, depression, and

high blood pressure.[1]  (R.[2] at 10.)  His applications were denied initially and after a hearing held in October 2007 before Administrative Law Judge (ALJ) Robert E. Ritter.  (Id. at 7-73.) The Appeals Council then denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the administrative hearing.

Plaintiff was 43 years old at the time of the hearing, 5 feet 5 inches tall, and weighs 135 pounds.  (Id. at 31, 40.)  He quit school when in the ninth grade.  (Id. at 32.)  He never obtained a General Equivalency Degree (GED), nor has he received any other training.  (Id.) He is married, but separated, and lives with his oldest son.  (Id. at 41.)  He has been living with, and off, his son since 2004.  (Id. at 45.)

Plaintiff started working washing cars when he was twelve or thirteen years old.  (Id.) He last worked in July 2003 filling oxygen tanks at a medical facility.  (Id. at 32-33.)  This job took less than a week to learn.  (Id. at 33.)  Any job Plaintiff has held has been unskilled and required the use of his hands and back.  (Id. at 33-34.)

Plaintiff first sustained injuries in 1995 when he hurt his low back trying to move a bale of clothes.  (Id. at 34.)  He never fully recovered and had to be moved to light duty.  (Id. at 35.)

---

[1]Neither application is in the record; however, neither party disputes that they were filed.

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

- 2 -

He had another injury to his low back that affected his bending, stooping, lifting, and similar motions.  (Id.)

In approximately 2000, he injured his right shoulder.  (Id. at 36, 38.)  He cannot raise it over his head.  (Id. at 36, 46.)  He has not had an operation for his back or shoulder because of a lack of funds.  (Id. at 36.)

In his last job, he injured his two hands by constantly having to screw and unscrew valves.  (Id. at 36-37.)  The company paid for an operation.  (Id. at 37, 39.)

Plaintiff further testified that he can not sit or stand for too long, walk too far, bend over, or lift things.  (Id. at 37.)  Sometimes his "hands work okay"; sometimes they do not. (Id.)  His physical limitations make him depressed.  (Id. at 38.)  He cries almost every day.  (Id. at 50.)  He has no money to see a doctor about his depression.  (Id. at 51.)  He is in constant pain.  (Id. at 38.)  His back pain is normally an eight on a ten point scale, with ten being the most pain he could stand.  (Id. at 42.)  He takes an over-the-counter medication, Doan's pills, and sleeps on a heating pad.  (Id.)  He was once given Oxycontin at an emergency room.  (Id.) This lowered his pain to a six or seven.  (Id.)  He had had an x-ray taken of his back, but never heard the results.  (Id. at 43.)  A magnetic resonance imaging (MRI) of his neck revealed that the neck problem was related to his shoulder problem.  (Id. at 44.)

Also, he has a condition called Barrett's Esophagus.  (Id. at 38.)  His throat swells up occasionally.  (Id.)

His pain prevents him from sleeping well at night.  (Id. at 47.)

The only thing that Plaintiff can do during the day is watch television. (<u>Id.</u> at 48.) He cannot do any chores and has no social outlets except attending church on Sundays. (<u>Id.</u> at 48, 49.) He makes himself sandwiches to eat. (<u>Id.</u> at 48-49.) He drinks approximately six beers and smokes six cigarettes a week. (<u>Id.</u> at 49.)

Plaintiff testified that his back problems alone keep him from working. (<u>Id.</u> at 51.) The longest he can sit or stand is ninety minutes. (<u>Id.</u> at 52.) The longest he can walk is thirty minutes. (<u>Id.</u>) The heaviest thing he can lift is a glass of water. (<u>Id.</u> at 53.) He has not attempted to lift anything in the past thirty days. (<u>Id.</u> at 62.) He no longer drives a car because he cannot stay focused. (<u>Id.</u> at 53.) There is no job he could do eight hours a day, five days a week. (<u>Id.</u> at 57.) He applied for work in 2006 with "a temporary company." (<u>Id.</u> at 58.) He was sent out on one job, but could not do it. (<u>Id.</u>) What he told a vocational rehabilitation counselor, Mr. England, in 2006 is still true. (<u>Id.</u> at 61.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical and mental residual functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (<u>Id.</u> at 120-27.) Throat cancer, chronic back pain, bilateral carpal tunnel syndrome, depression, and high blood pressure limit his ability to work by preventing him from being able to sit or stand for long, causing him to be depressed, preventing him from bending or lifting, and causing him to be in constant pain. (<u>Id.</u> at 121.) These impairments first bothered him on July 2, 2003, and

prevented him from working that same day. (Id.) His medications include Lisinopril for high blood pressure, Tramadol for pain, and Carafate[3] for throat cancer. (Id. at 125.) None had any side effects. (Id.)

The month after Plaintiff filed his applications, his twenty-four year old son completed a Function Report on his behalf. (Id. at 105-12.) Plaintiff lives with him. (Id. at 105.) He helps Plaintiff bathe, dress, get fed, and get ready for bed. (Id. at 105.) Before his injuries, Plaintiff "was able to get around like a healthy person." (Id. at 106.) Now, he does not sleep well and is always in pain. (Id.) He lays out Plaintiff's toiletries and medicine. (Id. at 107.) He cooks enough food so that Plaintiff merely has to microwave a meal. (Id.) Plaintiff cannot do any chores. (Id.) Plaintiff has no hobbies and does not spend time with other people. (Id. at 109.) Plaintiff's impairments affect his abilities to lift, sit, climb stairs, squat, kneel, bend, stand, use his hands, reach, complete tasks, get along with others, walk, remember, and concentrate. (Id. at 110.) Plaintiff can only lift five pounds and walk for half a block before having to stop and rest for thirty minutes. (Id.) He cannot pay attention for long. (Id.) Plaintiff was once fired for hitting a supervisor with orange juice. (Id. at 111.) He does not like change, cries and talks to himself, and screams at others. (Id.)

Completing a form requesting information about any work performed after his alleged disability onset date, Plaintiff reported that he worked for Spherion Staffing for twenty hours a week beginning on July 5, 2002; for Human Resource Staffing, LLC, from June 10 to June

---

[3]Carafate is usually prescribed for the treatment of ulcers. See Drugs.com, http://www.drugs.com/search.php?searchterm=carasate (last visited Aug. 30, 2011).

22, 2004; and for Kessler Containers, Ltd., on July 10, 2004. (Id. at 91-97.) He stopped working at the last two jobs because of his medical condition. (Id. at 92-93.) A disability onset date of July 2, 2003, was recommended due to his unsuccessful work attempts. (Id. at 98.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications. (Id. at 148-55.) His back pain had become worse since he completed the earlier disability report. (Id. at 149.) His pain made it hard for him to concentrate. (Id.) Also, he has been depressed and had suicidal ideation. (Id.) He had seen Jerome Levy, M.D., for his back and Wayne Stillings, M.D., for his depression. (Id. at 150.) In addition to the three medications listed on the earlier report, he was taking cyclobenzaprine for his back spasms and hydrocodone for pain. (Id. at 152.) These also had no side effects. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin when Plaintiff was admitted to DePaul Health Center on June 29, 2003, after experiencing chest pain with shortness of breath. (Id. at 244, 263.) Das Sundeep, M.D., examined Plaintiff the next day. (Id. at 234-36, 239-40, 259-60.) He noted Plaintiff's social history of smoking a pack of cigarettes a week and drinking a twelve-pack of beer on weekends. (Id. at 234.) On examination, he described Plaintiff as pleasant and in no acute distress, alert and oriented times three, and with a normal mood and affect. (Id.) He also noted that Plaintiff's first two sets of troponins[4] were negative; the third was slightly elevated. (Id.)

---

[4]"Troponins are specific proteins found in heart muscle." The Free Dictionary: Medical Dictionary, http://medical-dictionary.thefreedictionary.com/troponins+test (last visited Aug. 30, 2011). "When heart muscle is damaged, . . . troponins leak out of cells and into the bloodstream.

Another set was to be checked. (Id. at 235.) If that was increasing, Plaintiff was to be ruled out for a myocardial infarction and, if necessary, scheduled for a stress test and a gastrointestinal (GI) consultation. (Id.) The consulting GI physician, Robyn Haithcock, Sr., D.O., noted a social history of smoking and drinking a six-pack of beer of weekends. (Id. at 249.) He also noted the emergency room report describing Plaintiff as intoxicated when he came in. (Id.) An endoscopy revealed a mass in the distal part of the esophagus, gastritis, and a duodenal erosion. (Id. at 237-38, 247-48.) The mass was biopsied, but could not be safely removed. (Id. at 237.) The biopsy revealed Barrett's esophagus.[5] (Id. at 245.) Consequently, Plaintiff was started on a proton pump inhibitor and Carafate flurry; he improved and was able to eat and drink without any problem. (Id.) A computed tomography (CT) scan of his chest showed a "[p]atchy consolidation or atelectasis at the lower lobes bilaterally" and no other problems. (Id. at 265.) A chest x-ray was normal. (Id. at 266.) His blood pressure was determined to be high so he was started on Lisinopril. (Id. at 245.) The nights of June 30 and July 1, Plaintiff complained of being unable to sleep due to chest pains that radiated to his back. (Id. at 256, 257.) He was discharged home on July 3 and to engage in such activity as he could tolerate. (Id. at 245, 251.) He was also to avoid tobacco and alcohol as either could

---

Increased troponin levels indicated myocardial infarction or injury in a person with chest pain or pressure." Id. "People without heart damage have troponin levels less than 0.5 ng/ml." Id. Plaintiff's third set was 0.8. (R. at 259.)

[5]"Barrett's esophagus is a condition in which the tissue lining the esophagus – the muscular tube that connects the mouth to the stomach – is replaced by tissue that is similar to the lining of the intestine." National Digestive Diseases Information Clearinghouse, Barrett's Esophagus, http://digestive.niddk.nih.gov/ddiseases/pubs/barretts (last visited Aug. 30, 2011). It is commonly found in people with gastroesophageal reflux disease. Id.

make his stomach worse.  (Id. at 245.)  He was to follow-up with Dr. Haithcock in two to three weeks.  (Id. at 251.)

Plaintiff was admitted again to DePaul Health Center on January 11, 2004, after experiencing acute onset hematemesis (vomiting of blood) and upper epigastric pain.  (Id. at 285, 291.)  He told the admitting physician that he had drunk beer prior to the episode.  (Id. at 285.)  The chest tightness did not radiate, nor were there any palpitations, fever, chills, or sweats.  (Id.)  His troponin levels were checked twice and were less than 0.1.[6]  (Id.)  Chest x-rays were normal.  (Id. at 282.)  He told a consulting gastroenterologist, Melvin B. Saltzman, D.O., that he had been eating a cucumber before vomiting blood.  (Id. at 282.)  He had mild upper epigastric tenderness to palpation and was scheduled for an esophagogastroduodenoscopy (EGD) the next day.  (Id. at 285.)  The EGD revealed mild gastritis, a small hiatal hernia, and no evidence of mass or gross evidence of Barrett's esophagitis.  (Id. at 289.)  He was discharged the next day with Lisinopril for his blood pressure, Prevacid (for gastroesophageal reflux disease), and Carafate.  (Id. at 281.)  He was also to follow-up with his primary care physician in one or two weeks.  (Id.)

The remaining medical records before the ALJ were the reports of consultative examinations and an assessment by a non-consultative health care provider.  The reports were complied at the request of the state agency or Plaintiff's attorney.

The first category of reports begins with that of a consultative examination of Plaintiff by Elbert H. Cason, M.D., in March 2006.  (Id. at 295-301.)  Plaintiff reported that he had last

_____

[6]See note 4, supra.

worked in December 2005 doing factory work. (Id. at 295.) His chief complaints were chronic back pain, esophageal erosion, carpal tunnel problems, and high blood pressure. (Id.) He had the back pain since 1992 and had subsequently been hospitalized for one week. (Id.) The pain radiates to his legs, is sharp, and prevents him from walking farther than one and a half blocks, standing for longer than fifteen minutes, sitting for longer than thirty minutes, and lifting more than forty pounds. (Id.) He was on medication for the esophageal erosion. (Id.) It flares up occasionally, but not frequently. (Id.) He had surgery on his two wrists two years earlier; the wrists were better but not completely well. (Id.) He is on medication for his high blood pressure, which he had had for five years, but ran out of it two days earlier. (Id. at 295-96.) His blood pressure readings that day were high. (Id. at 296.) He drinks a couple of beers a day and occasionally smokes cigarettes. (Id.) On examination, he had a decreased range of motion with paravertebral lumbar area tenderness, no muscle spasms, and decreased straight leg raises which caused low back pain. (Id. at 297, 301.) Specifically, flexion and extension were 70 degrees and lateral flexion was 10 degrees on the right and the left with low back pain. (Id.) He could heel and toe stand and squat. (Id. at 297.) His gait and station were normal without the use of any assistive device. (Id.) His cervical spine, ankle, knee, wrist, elbow, and shoulder motions were all normal. (Id.) He had normal strength in the major muscle groups in both his upper and lower extremities. (Id. at 297, 300.) The Phalen's and Tinel's tests[7] for

---

[7]Phalen's and Tinel's tests, or signs, are common tests used in diagnosing carpal tunnel syndrome. See Jonathan Cluett, M.D., Carpal Tunnel Syndrome, http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm (last visited Aug. 30, 2011). "Tinel's test is performed by tapping the median nerve along its course in the wrist. A positive test is found when this causes worsening of the tingling in the fingers when the nerve is tapped." Id.

his right wrist were both positive; for the left wrist, the Phalen's test was positive, the Tinel's test was negative. (Id.) Both hands could be fully extended; fists could be made; fingers could be opposed and used for buttoning, writing, and manipulating small tools and parts. (Id. at 297.) "The remainder of the musculoskeletal examination was unremarkable." (Id.) He appeared alert and oriented times three. (Id.) He had no joint tenderness or inflammation, but did have tenderness in his paravertebral lumbar area. (Id.) He did not have a malignancy of the esophagus, but did have an esophageal erosion condition which periodically bothered him. (Id.)

That same month, L. Lynn Mades, Ph.D., a licensed psychologist, performed a psychological evaluation of Plaintiff. (Id. at 304-08.) Plaintiff complained of chronic back pain, depression, throat cancer, and high blood pressure. (Id. at 304.) He attributed his depression to his throat cancer and not being able to work. (Id.) He was not happy and was increasingly irritable. (Id.) He had felt this way for most of the day every day since 2003. (Id.) He last drank beer the day before, when he had drunk two sixteen-ounce beers. (Id. at 305.) He drank approximately a six-pack of beer a week. (Id.) Dr. Mades noted that Plaintiff had likely abused alcohol in 2003 when he presented to the emergency room intoxicated and claiming to drink only a six-pack of beer on the weekends. (Id.) She did not consider him a reliable informant. (Id.) When in school, he was frequently suspended for fighting and left after being expelled. (Id.) His longest period of employment was six years. (Id. at 306.) He

---

"Phalen's test is done by pushing the back of [one's] hands together for one minute. This compresses the carpal tunnel and is also positive when it causes the same symptoms [one] has been experiencing with [his or her] carpal tunnel syndrome." Id.

had a cooperative and pleasant attitude, an alert expression, good eye contact, normal speech in rate and rhythm, an euthymic (joyful or tranquil) mood, and a slightly restricted but generally appropriate affect.  (Id. at 306.)  He did not have any preoccupations, apparent mood disturbance, delusions, thought disturbances, perceptual distortions, or hallucinations.  (Id.) His reality testing appeared adequate; his flow of thought was logical and sequential.  (Id.)  He denied any suicidal or homicidal ideation.  (Id.)  He was oriented in all spheres, was able to repeat six digits forward, and could name four past presidents and the current president, governor, and mayor.  (Id. at 306-07.)  He could perform simple calculations without difficulty, had a good ability to assess essential shared characteristics between objects, had a fair interpretation of proverbs, and had a poor to fair expressed verbal judgment.  (Id. at 307.)  His insight and judgment were "slightly limited."  (Id.)  He reported that he spent his time watching television and occasionally did a few household chores.  (Id.)  He was able to take care of his personal needs.  (Id.)  During the examination, he maintained adequate attention and concentration with appropriate persistence and pace.  (Id.)  Dr. Mades diagnosed Plaintiff with alcohol abuse and depressive disorder, not otherwise specified.[8]  (Id.)  She rated his Global

---

[8]According to the *Diagnostic and Statistical Manual of Mental Disorders* 4 (4th ed. Text Revision 2000) (DSM-IV-TR), each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

Assessment of Functioning as 75 to 80.[9]  (Id. at 308.)  She noted that Plaintiff "presents with complaints of depression, but reports few symptoms and does not present as significantly depressed.  Depressive symptoms appear minimal, and are likely related to alcohol use."  (Id.) She opined that his prognosis was fair if he abstained from substance use.  (Id.)

After Dr. Mades issued her report, Sherry Bassi, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 309–22.)  Plaintiff was described as having an affective disorder, i.e., depression, not otherwise specified, and substance addiction disorder, i.e., alcohol abuse, that were not severe.  (Id. at 309, 312, 317.)  His two disorders resulted in mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (Id. at 319.)  Nor were there any episodes of decompensation of extended duration.  (Id.)

In April, x-rays were taken of Plaintiff's lumbar spine and revealed small anterior osteophyte formation at L4 and L-5.  (Id. at 325.)

Plaintiff was evaluated again in January 2008 by Thomas J. Spencer, Psy.D.  (Id. at 343-50.)  Plaintiff's chief complaints were chronic back problems, depression, high blood pressure, and a torn rotator cuff.  (Id. at 343.)  His pain was typically an eight or nine on a ten-point

---

[9]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

scale and prevented him from sleeping at night. (<u>Id.</u>) He had limited use of his right arm and needed help getting dressed. (<u>Id.</u>) He was not taking any medication. (<u>Id.</u>) He had been depressed for at least the past twenty years. (<u>Id.</u> at 344.) He had daily crying episodes, and began crying during the interview. (<u>Id.</u>) He rarely had a good day. (<u>Id.</u>) He and his wife had been separated for the past seven years. (<u>Id.</u>) He had "'a lot'" of behavior problems in school and dropped out after the ninth grade. (<u>Id.</u>) He might drink a twelve-pack of beer during the week. (<u>Id.</u>) He watches television or sits around the house but is unable to do much due to the constant pain. (<u>Id.</u>) His eye contact was fair; his speech was within normal limits. (<u>Id.</u> at 345.) He shifted in his seat as if in pain but walked without assistance and with no unusual mannerisms or motor behavior. (<u>Id.</u>) He seemed to minimize his use of alcohol. (<u>Id.</u>) His insight and judgment appeared questionable. (<u>Id.</u>) On the Wechsler Adult Intelligence Scale-III (WAIS-III), he had a full scale intelligence quotient (IQ) of 68, a performance IQ of 69, and a verbal IQ of 72. (<u>Id.</u>) The full scale score placed him in the "extremely low range of intellectual functioning." (<u>Id.</u>) Dr. Spencer thought this score was low "given his presentation during the interview and reported education history." (<u>Id.</u> at 347.) On the Wechsler Memory Scale-III (WMS-III), he had a General Memory Index of 86, placing him within the mean; Auditory, Visual Immediate, and Auditory Delayed Indices were low average; Visual Delayed and Auditory Recognition Indices were average; and his Working Memory Index was borderline. (<u>Id.</u> at 345-46.) On a test to determine speed for attention, sequencing, mental flexibility, visual search, and motor function, his two scores were two standard deviations from the mean. (<u>Id.</u> at 346.) His scores on the Minnesota Multiphase Personality Inventory-2

(MMPI-2) indicated over-endorsed symptoms of a pathological nature. (<u>Id.</u>) His scores on the Test of Memory Malingering suggested he was approaching the test in "a forthright manner." (<u>Id.</u> at 346-47.) Dr. Spencer diagnosed Plaintiff with depressive disorder, NOS, and alcohol abuse. (<u>Id.</u> at 347.) He had a GAF of 55-60.[10] (<u>Id.</u>)

Dr. Spencer also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (<u>Id.</u> at 348-50.) In the category of understanding, remembering, and carrying out instructions, Plaintiff had a mild limitation in understanding, remembering and carrying out simple instructions and in making judgments on simple work-related decisions. (<u>Id.</u> at 348.) A limitation was mild when it was "slight" but did not prevent the individual from generally functioning well. (<u>Id.</u>) When the instructions or decisions were complex, Dr. Spencer marked that Plaintiff's limitations were both moderate and extreme. (<u>Id.</u>) Moderate was "more than a slight limitation . . . but the individual is still able to function satisfactorily." (<u>Id.</u>) He noted that Plaintiff had "demonstrated some impairment in [his] ability to consistently understand [and] remember complex instructions." (<u>Id.</u>) In the category of interacting appropriately with supervision, co-workers, and the public and in responding to changes in the routine, work-setting, Dr. Spencer rated Plaintiff as having a mild limitation in his ability to interact appropriately with such persons and a moderate limitation in his ability to respond to such changes. (<u>Id.</u> at 349.) He noted that Plaintiff denied having any conflict in the workplace

---

[10]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." <u>DSM-IV-TR</u> at 34 (emphasis omitted).

but explained that he tended to isolate himself due to his depression.  (Id.)  Asked if Plaintiff's impairments included alcohol and/or substance abuse which contributed to his limitations, Dr. Spencer responded that Plaintiff claimed to be drinking only a twelve-pack of beer a week but seemed to minimize his drinking.  (Id.)

Reports in the second category – evaluations of Plaintiff performed at his attorney's request – begin with one by Bruce Schlafly, M.D., following his evaluation of Plaintiff's carpal tunnel problems in May 2004 and again in May 2005, apparently pursuant to a worker's compensation claim.  (Id. at 326-30.)  He noted in his 2005 report that Plaintiff had had carpal tunnel release surgeries on both hands in the intervening year.  (Id. at 329.)  The surgeries had been performed by a Dr. Howard and had been followed by physical therapy sessions.  (Id.) Dr. Howard had recommended light duty work and had released Plaintiff from his care in April 2005.  (Id.)  Plaintiff reported that the surgery had helped with regard to the numbness but he continued to have soreness and tenderness in his hands.  (Id.)  He had not returned to his former employment but was doing odd jobs.  (Id.)  On examination, he had a good range of motion in his hands except for a mildly decreased flexion of his left index finger.  (Id. at 329-30.)  In his right wrist, he had 60 degrees dorsiflexion and 58 degrees palmar flexion.  (Id. at 330.)  In his left wrist, he had 57 degrees dorsiflexion and 58 degrees palmar flexion.  (Id.) His grip strength in his right hand was 52 pounds and in his left hand was 58.  (Id.)  Phalen's and Tinel's tests were negative bilaterally.  (Id.)  Dr. Schlafly opined that Plaintiff had a 25 percent permanent partial disability of each hand measured at the level of the wrist joint.  (Id.)

Wayne A. Stillings, M.D., a psychiatrist, evaluated Plaintiff in December 2005. (Id. at 331-37.)  In addition to records relating to three worker's compensation claims and records from DePaul Health Center, Dr. Stillings had before him Plaintiff's records from Doctor's Clinical Group, including those of Dr. Poetz, from May 1996 to February 2004; from Dr. Howard; from Dr. Schlafly; and from a physical therapist. (Id. at 331-32.)  Plaintiff reported that he had impaired bilateral grip strength and pain with use of his hands beginning in January 2003. (Id. at 332.)  This prevented him from holding down a job. (Id.)  He also had chronic low back pain radiating to his lower extremities. (Id.)  This began in 1992. (Id.)  Plaintiff further reported that he had become increasingly depressed beginning in 2003. (Id.)  "His depression [was] characterized by chronic low moods, poor concentration, loss of interest and pleasure in life, confused and slowed thinking, physical fatigue, feeling emotionally drained, reduced libido, thoughts that life is not worth living and occasional thoughts of death with fleeting suicidal ideation but not specific plans . . . ." (Id.)  Before 2003, his mood was a 10/10; it was now a 2/10. (Id.)  He was concerned about the potentially cancerous condition of his Barrett's esophagus. (Id.)  Plaintiff had never been under any psychiatric care or taken any psychotropic medication. (Id. at 333.)  He lived with his wife of nineteen years and two children, one twenty-four years old and one fourteen. (Id.)  He had had four worker's compensation claims, two relating to his back, one to a shoulder, and one to his wrists and hands. (Id.)  Although he had abused drugs and alcohol in the past, he had "been clean and sober for the past 15 years." (Id.)  Dr. Stillings summarized his findings on the mental status examination as follows.

> [Plaintiff] was an alert, cooperative, anxious, casually but neatly attired, black male, with a slight degree of psychomotor retardation. He had little spontaneous speech, but it was normal in rate and rhythm. There was no formal thought disorder. He appeared to be experiencing some degree of pain on ambulation and when rising from a chair. His affect was somewhat distant. His mood is moderately depressed. [Plaintiff] denied suicidal and homicidal ideation. He was oriented to time, place, and person. Recent and remote memory functions are intact. He has some difficulty organizing himself cognitively. Verbal comprehension was fair. Concentration was fair, as well. Intellectually, he seems to function in the region of low intelligence. Insight and judgment are questionable.

(Id. at 335.) Plaintiff's responses on the MMPI-2 indicated that he "is extremely disturbed, claiming more psychological symptoms than the average patient. He may be exaggerating in order to gain attention or treatment." (Id.) He was depressed and anxious and "probably somewhat angry and cynical." (Id.) "His behavior may be unpredictable, aloof, and withdrawn." (Id.) "People with this profile may have a history of excessive alcohol . . . use." (Id.) His scores on the Wide Range Achievement Test-3 (WRAT-3) were at the seventh grade level in reading and fifth grade level in arithmetic. (Id.) Dr. Stillings diagnosed Plaintiff with depressive disorder, NOS; pain disorder due to psychological factors and a general medical condition; and a history of polysubstance dependence, in remission. (Id. at 335-36.) Plaintiff had a GAF of 50.[11] (Id. at 336.) Dr. Stillings opined that he was disabled from gainful employment. (Id.)

That same month, Plaintiff was evaluated for his worker's compensation claim by Jerome F. Levy, M.D. (Id. at 339-42.) On examination, Plaintiff had a normal range of

---

[11]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

motion, with moderate discomfort, of the back and tenderness in the low lumbar area in the midline. (Id. at 341.)  He had no muscle spasm. (Id.)  He had a normal gait and was able to walk on heels and toes without limping or difficulty. (Id.)  He had a full range of motion, with moderate discomfort, in his right shoulder. (Id.)  The strength in his upper extremities above the wrists were equal. (Id.)  Phalen's and Tinel's tests were negative. (Id.)  Dr. Levy assessed him as having a permanent partial disability of twenty-five percent of each upper extremity at the wrist, of fifteen percent of the body as a whole due to his back injuries, and of fifteen percent of the right upper extremity at the shoulder. (Id. at 342.)

In June 2006, James M. England, Jr., performed a vocational rehabilitation evaluation of Plaintiff. (Id. at 206-13.)  Mr. England reviewed Plaintiff's medical records from Drs. Poetz,[12] Schlafly, and Howard; his physical therapy records; and the report of Dr. Stillings. (Id. at 207-09.)  Additionally, Plaintiff outlined his medical and job histories and his daily activities for Mr. England. (Id. at 209-211, 212.)  Plaintiff informed him that his primary pain is in his low back radiating to his legs. (Id. at 210.)  He has pain and numbness in his hands, greater on the right than on the left. (Id.)  His grip is poor, particularly in his right hand. (Id.)  He has pain in his low back if he reaches up "very high." (Id.)  He can stand for twenty minutes, sit for thirty minutes, and walk for a block or two. (Id.)  He cannot bend over "very well" and avoids kneeling and squatting. (Id.)  The heaviest thing he can lift or carry is a bag of groceries. (Id.)  He is depressed about his life. (Id. at 211.)  He lives with his wife, who

---

[12]There are no records of Drs. Poetz or Howard included in the administrative record.  Dr. Poetz appears to have been Plaintiff's primary care physician and was copied on the consultative reports of Dr. Sundeep.  Dr. Howard apparently performed carpal tunnel release surgery on Plaintiff.

works in a hospital cafeteria.  (Id.)  He no longer enjoys his former hobbies of fishing, walking in the park, playing with his children, and playing billiards.  (Id.)  On the WRAT-3, he scored at the beginning of the high school level in reading and at the fifth-grade level in arithmetic.  (Id. at 212.)  Mr. England opined that this score would be sufficient "for a variety of entry-level employment settings."  (Id.)  He noted the discrepancies between Dr. Howard's opinion that Plaintiff could return to work without restrictions involving the upper extremities, Dr. Schlafly's opinion that he should avoid repetitive gripping and lifting with his hands, and Dr. Stillings' opinion that Plaintiff was permanently and totally disabled.  (Id.)  Mr. England concluded that Plaintiff (a) had vocational alternatives if Dr. Howard's assessment was correct, (b) could not return to any past relevant work if Dr. Schafly's assessment was correct, and (c) could not perform any work if Dr. Stillings' assessment was correct.  (Id. at 213.)  He further concluded that someone with Plaintiff's combination of physical and psychiatric problems would apparently not be capable of sustaining employment and was not a good candidate for vocational rehabilitation.  (Id.)

### The ALJ's Decision

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2010, and had not engaged in substantial gainful activity at any time relevant to his decision.  (Id. at 11-12.)

The ALJ next found that Plaintiff had medically determinable impairments of osteoarthritis of the lumbar spine, hypertension, esophagitis, and a depressive disorder.  (Id.

at 12.)  These impairments, however, did not singly or in combination, significantly limit his ability to perform basic work related activities for twelve consecutive months, nor were they expected to do so.  (Id.)  Therefore, they were not severe.  (Id.)

After summarizing in detail Plaintiff's testimony and the medical records and reports, the ALJ concluded that his medically determinable impairments could not be expected to produce more than minimal symptoms.  (Id. at 13-17.)  He further found that Plaintiff's statements about the intensity, duration, and limiting effects of his symptoms were not entirely credible.  (Id. at 17.)  For instance, x-rays of his back showed only small anterior osteophyte formations at L4 and L5 and examinations of Plaintiff showed a normal gait and station, an ability to walk heel and toe without difficulty, no obvious deformity of the back, a normal range of motion, and no muscle spasms.  (Id.)  His highest earnings were from 1995 to 2003 although he injured his back in 1995 and there was no evidence that any injury to his back had occurred since or that it had worsened.  (Id.)  Additionally, he only took an over-the-counter medication, Doan's pills, for his back.  (Id.)

As to his right shoulder, Plaintiff had never been diagnosed with any specific impairment of the shoulder and there was no objective evidence of any limitation.  (Id.)  On examination, he had a full range of motion in his shoulder "'with encouragement,'" no atrophy in the muscles, a normal sensory examination, and normal strength in the major muscle groups in his upper and lower extremities bilaterally.  (Id.)

His bilateral carpal tunnel syndrome had been treated.  (Id. at 18.)  On various examinations, he had normal strength in the major muscle groups in his upper extremities,

normal grip strengths, negative Phalen's and Tinel's tests in December 2005, a good range of motion in his hands and wrists, and, according to Dr. Cason, could use his fingers for buttoning, writing, using small tools, and handling parts. (Id.) And, he did not take any medication for hand pain or tingling. (Id.)

Plaintiff had been admitted to the hospital twice for an epigastric problem; the second time was for one day in January 2004. (Id.) He had not been treated for it since. (Id.) And, he had had no weight change due to any eating or digestion problem. (Id.)

Plaintiff had been diagnosed with hypertension and prescribed medication. (Id.) He had not had any hypertensive crises and had apparently not suffered any end organ damage. (Id.)

Addressing Plaintiff's allegations of a depressive disorder, the ALJ found that he had been vague in reports about his symptoms, which the evidence indicated he tended to exaggerate. (Id.) The ALJ discounted Dr. Stillings' interpretation of the results on the MMPI-2 "as it appears to have been based on the faulty premise that [Plaintiff] was forthrightly responding to questions asked in completing it." (Id. at 19.) Plaintiff had not been truthful to Dr. Stillings about being "'clean and sober' for the past 15 years when in fact, he was described as intoxicated at his hospital admission in June 2003 and, at other times, has acknowledged at least some alcohol use." (Id.) And, Dr. Stillings' assessment of Plaintiff's GAF as being 50 was given no weight as it was inconsistent with other evidence and was apparently based more on Plaintiff's subjective complaints than on any objective findings. (Id.) Moreover, Dr. Stillings saw Plaintiff only once and had before him no other records of treatment for mental

health issues.  (<u>Id.</u>)  The ALJ noted that Dr. Mades had assessed Plaintiff's GAF as 75-80 three months later.  (<u>Id.</u>)

The ALJ further noted that Dr. Spencer had opined that Plaintiff would potentially have a more than moderate limitation only in understanding, remembering, and carrying out complex work instructions and in making judgments on complex work-related decisions.  (<u>Id.</u>) These limitations did not have more than a minimal impact on Plaintiff's ability to work because his past work was unskilled and would not require the ability to do more than simple work.  (<u>Id.</u>)  Addressing Plaintiff's scores on the WAIS-III, the ALJ noted that Dr. Spencer observed that the scores were much lower than anticipated given that Plaintiff attended a regular classroom and given his general presentation during the interview.  (<u>Id.</u> at 20.)  The scores were also inconsistent with his ability to maintain successful employment in various jobs, including one that had lasted for six years.  (<u>Id.</u>)  "Considering [Plaintiff's] demonstrated propensity for distorting symptoms, it seems most probable that he intentionally depressed results on the WAIS-III to improve his chances of being found disabled."  (<u>Id.</u>)  And, Dr. Stillings considered Plaintiff to be of low average intelligence.  (<u>Id.</u>)  Also, his scores on the WASI-III were inconsistent with those on the WRAT-3 test administered by Mr. England. (<u>Id.</u>)

The ALJ next considered Plaintiff's daily activities and found them not to be limited by any physical conditions, noting that no restrictions were ever recommended by his physicians. (<u>Id.</u>)  His earnings record[13] favored his credibility but was outweighed by other detracting

---

[13]Plaintiff's earnings record is not included in the administrative record.

factors. (Id.) Mr. England's opinion that Plaintiff was unable to engage in any work activity was considered but given no weight as it was apparently based on Plaintiff's subjective reports and was inconsistent with the objective evidence. (Id.)

For the foregoing reasons, Plaintiff was found not to be disabled within the meaning of the Act. (Id. at 20-21.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any

impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, an impairment is not severe if it "amounts only to a slight abnormality that would not significantly limit the claimant's ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work[.]" **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant to prove his RFC and establish

that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  <u>See also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee v. Astrue**, 638 F.3d 860, 863 (8th Cir. 2011) (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789). <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**Discussion**

Plaintiff argues that the ALJ erred in (1) finding him not credible and, consequently, discounting the favorable opinion of Mr. England, the only vocational expert to render an opinion, and (ii) not considering the combined effect of his physical and mental impairments on his ability to engage in substantial gainful activity. The Commissioner disagrees.

<u>Credibility.</u> The ALJ concluded that Plaintiff's medically determinable impairments of osteoarthritis of the lumbar spine, hypertension, esophagitis, and a depressive disorder were not severe. "'A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.'" **Martise**, 641 F.3d at 923 (quoting 20 C.F.R. § 404.1508) (alteration in original). <u>See</u> <u>also</u> 42 U.S.C. § 423(d)(5)(A) (requiring that a claimant's complaints of pain or symptoms not be conclusive evidence of disability but there also be "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques").

"Symptoms are [a claimant's] own description of [his] physical or mental impairment." 20 C.F.R. §§ 404.1528(a), 416.928(a). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. §§ 404.1528(b), 416.928(b).

When evaluating a claimant's credibility, the ALJ must consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'"[14] **Id.** (quoting Goff, 421 F.3d at 792).

The only medical finding of a back problem were the April 2006 x-rays revealing small anterior osteophyte formations at L-4 and L-5. The severity of any pain from these formations depends entirely on Plaintiff's credibility. He testified that his back pain was at least an eight on a ten-point scale and that he took an over-the-counter medication and used a heating pad. His back problems alone prevent him from working and from sitting or standing longer than

---

[14]Plaintiff argues in his reply brief that the brevity of medical records is due to him having achieved maximum medical improvement. This argument is unavailing. There are no records of any medical attention that would have contributed to any improvement.

ninety minutes or walking longer than thirty minutes.  The records generated when Plaintiff sought medical attention at DePaul Health Center do not include any complaints of back pain, although he had reportedly had it since 1992 or 1995.[15]  Indeed, his only complaints of back pain to health care professionals are done in the course of examinations for his pending disability applications.  The notes of those examinations refer to Plaintiff having a normal gait and station, an ability to heel and toe stand and squat, and no need for an assistive device. Although he had a decreased range of motion in his low back when examined by Dr. Cason, he had no muscle spasms.  And, when examined by Dr. Levy he had a normal range of motion in his back with only moderate discomfort.  When undergoing a psychological examination by Dr. Spencer, he shifted in his seat as if in pain but walked without assistance and had no unusual motor behaviors.

In addition to the lack of objective medical findings supporting Plaintiff's claims of disabling back pain, his continuing to work for at least eight years after the onset of pain[16] and the absence of any aggravating factors further support the ALJ's conclusion that the back pain is not a severe impairment.  See **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009) (noting that a relevant factor in the ALJ's adverse credibility finding was the claimant continuing to work after the alleged onset of disability); **Goff**, 421 F.3d at 792-93 (finding that when evaluating the claimant's credibility the ALJ properly considered the fact that the claimant

---

[15]Plaintiff had given both years at various times.

[16]Indeed, Plaintiff had his best six years of earnings after the onset.

worked with his allegedly disabling impairments for three years and had no evidence of any deterioration).

Also detracting from Plaintiff's credibility was his use of only over-the-counter medication to relieve his pain and his failure to seek medical treatment for that pain. "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." **Singh v. Apfel**, 222 F.3d 448, 453 (8th Cir. 2000). <u>See</u> <u>also</u> **Hepp v. Astrue**, 511 F.3d 798, 83 (8th Cir. 2008); **Wagner v. Astrue**, 499 F.3d 842, 85 (8th Cir. 2007).

Plaintiff testified that he had not sought medical attention, which might have included prescription pain medication, due to a lack of funds, and such a lack may be "justifiable cause" for a failure of sufficient financial resources to follow prescribed or recommended treatment or to pursue such treatment to remedy a disabling impairment. <u>See</u> **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004); <u>accord</u> **Clark v. Shalala**, 28 F.3d 828, 831 n.4 (8th Cir. 1994). In order to be such cause, however, there must be evidence that the claimant was denied medical treatment due to financial reasons. **Goff**, 421 F.3d at 793; <u>accord</u> **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Such evidence is lacking in the instant case.

Also lacking are any functional limitations placed on Plaintiff by any treating physicians. This detracts from his credibility. <u>See</u> **Moore**, 572 F.3d at 525 (holding that "[a] lack of functional restrictions is inconsistent with a disability claim" and affirming adverse

credibility determination when claimant's testimony that she could not use her hands and was limited to sitting no longer than ten to fifteen minutes were limitations not imposed by any physician); **Samons v. Astrue**, 497 F.3d 813, 820-21 (8th Cir. 2007) (affirming adverse credibility determination supported, in part, by absence of any functional limitations although claimant described disabling back pain).

Additionally, the ALJ properly discounted Plaintiff's description of severely limited daily activities, including being able to lift nothing heavier than a glass of water and not being able to do anything but watch television occasionally, as being inconsistent with the medical record. See **Jones**, 619 F.3d at 975 (affirming adverse credibility determination of ALJ who found claimant's activities to be limited on a "self-imposed voluntary basis" rather than due to her medical condition); **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

The ALJ's conclusion that Plaintiff's hypertension was not severe is also supported by the record. There are references in the hospital records to his blood pressure being high, but there is nothing in the record to indicate that medication did not adequately address the problem.

When Plaintiff was first hospitalized in 2003, it was thought he had Barrett's Esophagus. He was told to avoid alcohol as it would make the condition worse. He did not, and returned the next year after experiencing upper epigastric pain after drinking beer. There was no evidence of Barrett's Esophagus. After being discharged from the first hospitalization,

Plaintiff was told to follow up with Dr. Haithcock; after being discharged from the second hospitalization, he was told to follow up with his primary care physician. He neither avoided alcohol or followed-up with a doctor. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005). See **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (claimant's noncompliance with her doctor's instructions to take her medications, follow her diet, and totally abstain from drugs and alcohol was a valid consideration supporting adverse credibility determination); **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (failure of claimant with shortness of breath problems to stop smoking is a failure to follow a prescribed course of treatment and was properly considered when assessing his credibility); **Lewis v. Barnhart**, 353 F.3d 642, 647 (8th Cir. 2003) (ALJ properly considered failure of claimant alleging disability due to asthma and joint pain to stop smoking cigarettes daily and to start exercising as her doctors recommended). He did report two years later, however, that his esophageal problems flared up only occasionally. Conditions that are controlled by medication cannot be considered disabling. **Brown v. Astrue**, 611 F.3d 941, 955 (8th Cir. 2010).

Finally, the ALJ found that Plaintiff had a depressive disorder. When completing a Disability Report, Plaintiff stated that his depression began in July 2003. The next month, he told Dr. Stillings that he had become increasing depressed beginning in 2003, having had a mood that was a 10 out of 10 before that year, and was concerned about the potentially cancerous condition of his Barrett's Esophagus – he had been told twenty months earlier that he did not have Barrett's Esophagus. Three months later, Plaintiff was described as being alert

and oriented times three. The same month he appeared thus, he informed an examining psychologist, Dr. Mades, that he attributed his depression to throat cancer and to not being able to work. He did not appear to be depressed, but did appear to be euthymic, alert, and pleasant. His depressive symptoms were minimal. Almost two years later, in January 2008, he informed Dr. Spencer that he had been depressed for at least twenty years. He had never sought mental health treatment or taken psychotropic medication. These inconsistencies, including in the varying dates and causes (some clearly refuted by the record), were properly considered as detracting from Plaintiff's credibility. See **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir.2008) ("An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole.").

Another inconsistency detracting from Plaintiff's credibility is his varying reports of how much beer he drinks. When hospitalized in 2003, he told one doctor he drank twelve beers a week and another doctor six. When hospitalized in 2004, he told the admitting physician that he had experienced the pain after drinking beer; he later told another doctor it was after eating a cucumber. He told Dr. Cason he drank a couple of beers a day. The same month, he told Dr. Mades he drank six beers a week. He told Dr. Spencer it was twelve beers. In **Karlix v. Barnhart**, 457 F.3d 742, 748 (8th Cir. 2006), the ALJ's finding that a claimant was "unreliable because his testimony at the administrative hearing regarding his consumption of alcohol conflicted with medical documentation" was found to be a sufficient reason for discrediting the claimant's testimony.

Plaintiff places great emphasis on the findings of Dr. Stillings that he is disabled. This finding, however, is at odds with his examination of Plaintiff, who was found to be alert, cooperate, anxious, with no thought disorder, oriented times three, and with fair concentration, but questionable insight and judgment. Moreover, Dr. Stillings' conclusion about Plaintiff's employability is clearly based on his statements, including one that he was concerned about a condition he had been told the previous year he did not have, that he lived with his wife although he was living with his son, and that he had been clean and sober although the record is replete to references to him drinking and minimizing his use of alcohol. Thus, the ALJ did not err in not giving great weight to Dr. Stillings' assessment.[17] See **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (rejecting argument that ALJ erred in assessing claimant's mental

---

[17]Plaintiff notes that Dr. Stillings is a psychiatrist, but Drs. Mades and Spencer are psychologists. A licensed psychologist is an acceptable medical source. See 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Moreover, it is the ALJ's duty to determine whether the opinion of an acceptable medical source is supported by the evidence. See **Travis v. Astrue**, 477 F.3d 1037, 1041 (8th Cir. 2007); **Harwood v. Apfel**, 186 F.3d 1039, 1044 (8th Cir. 1999). When doing so, an ALJ may consider whether the claimant is exaggerating his symptoms. See **Jones**, 619 F.3d at 973 (holding that the ALJ was entitled to draw conclusions about the claimant's credibility based on a psychiatrist's observation that she was exaggerating her symptoms); accord **Davidson v. Astrue**, 578 F.3d 838, 844 (8th Cir. 2009).

Plaintiff also notes that Dr. Stillings' GAF of 50 is within the same decile as Dr. Spencer's GAF of 55-60. Regardless, the 50 reflects serious symptoms and the 55-60 reflects moderate symptoms. See notes 10 and 11, supra. Moreover, "The Commissioner has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity requirements of the mental disorders listings." **Jones**, 619 F.3d at 973-74 (alterations in original). Thus, "an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." **Jones**, 619 F.3d at 974 (internal quotations omitted). See **Halverson v. Astrue**, 600 F.3d 922, 931 (8th Cir. 2010) (finding that ALJ properly declined to give controlling weight to *one* GAF score of 40 that was inconsistent with other evidence).

impairments when medical opinion cited by claimant was "largely based" on her own statements).

Plaintiff further argues that the ALJ erred by not finding that his carpal tunnel problems were not severe impairments. When examined by Dr. Levy, after having had carpal tunnel release surgeries on both wrists, Plaintiff had a grip strength of at least 52 pounds and negative Phalen's and Tinel's tests in both hands. When examined the following year by Dr. Cason, he had positive tests in his right hand, a positive Phalen's test in his left hand, and a negative Tinel's test in his left hand. Still, Dr. Cason found he could fully extend his hands, make fists, oppose his fingers, and use his fingers for small manipulative tasks. The ALJ's conclusion that this wrist problems are not severe is supported by substantial evidence on the record as whole.

Next, Plaintiff argues that the ALJ erred in discounting Mr. England's conclusion that someone with Plaintiff's physical and psychiatric problems was unemployable. The ALJ discounted that conclusion because it was (a) apparently based on Plaintiff's subjective reports and (b) was inconsistent with the objective evidence. As discussed above, the ALJ's credibility decision is supported by substantial evidence on the record as a whole. Nor, as Plaintiff seems to suggest, does the fact that Mr. England was the only vocational expert to render an opinion require that that opinion be given controlling weight regardless of whether it is supported by the record.

Combination of Impairments. In his second argument, Plaintiff contends that the ALJ erred by not considering the combined effects of his physical and mental problems.

The ALJ specifically twice held that Plaintiff did not "have an impairment *or combination of* impairments" that significantly limited "his ability to perform basic work activities." (R. at 12, 13 (emphasis added)). He then discussed each alleged impairment in detail and in succession.

When, as in the instant case, a claimant asserts multiple impairments, the Commissioner must "consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling." **Cunningham v. Apfel**, 222 F.3d 496, 501 (8th Cir. 2000) (citing 20 C.F.R. § 404.1523) . This requirement applies to both physical and mental impairments.  **Id.**  Accord **Delrosa v. Sullivan**, 922 F.2d 480, 484 (8th Cir. 1991).  Where, as here, the ALJ discusses and considers each of a claimant's impairments, his complaints of pain, and his daily activities, and then concludes that his impairments are not, singly *or in combination*, disabling, there is no error. See **Browning v. Sullivan**, 958 F.2d 817, 821 (8th Cir. 1992) (holding that, in such circumstances, "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable") (internal quotations omitted).

Plaintiff's second, and last, argument is without merit.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have

supported a contrary outcome or [if this Court] would have decided the case differently."

**Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.



/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  1st  day of September, 2011.